REGAN, Judge.
Plaintiff, LaGrange Realty, Inc., instituted this suit against the defendants, G. Lafayette Sheen[1] and Orleans Storage Company, Inc., for the reduction of the purchase price [2] of a cabin cruiser[3] from $2,500 to the sum of $633.73; the sum of $1,866.27 having been expended to repair the alleged defects which existed therein prior to the sale.
Defendants answered and denied that any defects existed in the vessel when it was sold to the plaintiff on September 17, 1953; but if a defect did exist at the time of the sale, that defendant possessed no knowledge thereof[4] and the plaintiff’s action is prescribed in one year by virtue of the limitation in Revised Civil Code, Articles 2534 and 2544, since suit was not i i-stituted until July 1, 1955, or one year and nine and a half months after the consummation of the sale.
From a judgment in favor of the defendants dismissing plaintiff’s suit, it has prosecuted this appeal.
The record reveals that the cabin cruiser when sold by the defendant to the plaintiff on September 17, 1953, was warranted to be sound and seaworthy, but that the plaintiff, through the efforts of John R. Perez, Jr., its Secretary-Treasurer, discovered the alleged defects [5] on or about Oc- . tober 25, 1954; that the plaintiff, on several occasions thereafter, unsuccessfully endeavored to secure a compromise from the defendant and finally was compelled to resort to the institution of this suit for the reduction of the purchase price of the boat on July 1, 1955.
In order to substantiate the existence of the defects in the cruiser prior to the date of sale plaintiff principally relies upon the testimony of Philip Duvic, Charles G. Justice, Jr., Gray Weaver[6] and William T. Wells.[7]
*713 Duvic testified that he and Cook were friends and that prior to the date of the sale he visited Cook at Oak Grove Lodge in DeLisle, Mississippi, on Wolf River, and that Cook invited him aboard the cruiser ■ on the day that he was bringing it to the R. C. Sellier Shipyard at DeLisle, Mississippi, for repairs and while they were cruising in the Bay of St. Louis he asked Cook what repairs were contemplated and “I was told the nature was thought to he rot and that she was leaking and that his intention was to take it to the shipyard for repairs. To what extent, however, I - have no knowledge, but I knew that it was with the idea of selling the vessel shortly thereafter.”
Charles G. Justice, Jr., testified that he had heard that the defendant’s boat was for sale and that he visited Sellier’s Shipyard in August of 1953, about one month prior to the sale for the purpose of making an inspection thereof. He observed at that time that the employees of the shipyard were in the process of installing a new “toe rail” and that, in doing so, they were covering up rotten wood rather than replacing it; that when this “toe rail” was affixed from bow to stern it would be-impossible to detect the decayed wood underneath ; “it was obvious to me that the boat was rotten and if it is rotten above the water line and alongside the side, it surely follows that there is rot below the water line.”
Gray Weaver testified that he had occasion to supervise the repair of the boat in November, 1954, and he knew that “there was rot in the wood and the boat seemed to have been in a collision.” When interrogated as to how long the rot had existed in the boat he responded “I cannot answer that question, I do not know * * *. There is no way for me to tell when that started.”
William T. Wells testified that the “hull had considerable wood decay” but he was unable to determine the cause thereof or to say how long the condition had existed.
On the other hand the defendant’s evidence discloses that during the month of August, 1953, or one month prior to the sale, the defendant, through its Vice President, A. M. Cook, had this cabin cruiser drydocked in Sellier’s Shipyard in DeLisle, Mississippi. Cook testified that he had instructed Sellier to make all necessary repairs and that he had made every effort to see that the vessel was seaworthy before the date of its sale. The principle work done at this time was the installation of plywood patches on the port and starboard side of the hull near the bow stern. The work that Duvic referred to as “rot”' were these patches, and whether it was rot or cracks in the plywood hull which Sellier repaired, Cook testified that he “really didn’t know.” He further asserted that within his knowledge no defects of any sort or nature whatsoever existed in the hull of the cruiser prior to the sale thereof to the plaintiff.
Noel Sellier, who had been working at the shipyard for twenty years, which was owned by his father, testified that he examined the boat thoroughly and that the hull was not rotten and that when it was removed from the shipyard it was in good condition. To substantiate the statement that the hull was not rotten he .asserted that the nature of the work required the use of brass screws which would “not have held” if the hull had been rotten. He emphasized that if the hull had actually been rotten he would have notified the owner immediately.
The testimony of John R. Perez, Jr., taken by the defendant pursuant to the Discovery Rule of the State of Louisiana [8] revealed that several days prior to the sale he had the boat inspected by a small boat operator. This man, whose name was never revealed on the trial hereof, inspected the vessel in the Southern Yacht Club *714 pen, located in that section of the City of New Orleans which has been colloquially designated as West End, took a trial run over the waters of Lake Pontchartrain and as a result thereof he pronounced the vessel in good condition.. This witness was not produced by the plaintiff and the only explanation offered as to why he was not called was that he had been introduced to Perez by a mutual friend and he knew nothing more about his identification. Perez further related that after plaintiff purchased the boat it was kept at an open dock[9] in Wolf River, near DeLisle, Mississippi, where, for 13 months, it was exposed to the elements and used almost every weekend for trips averaging five or more miles, d.uring all of which time it manifested no defects. It was never taken out of this water, was not kept in a boathouse and the canvas cover that had been used when the defendant owned the boat was not used after it was acquired by the plaintiff and no other form of shelter was provided. Perez further testified that during this period of 13 months or in July of 1954, he piloted the boat on a trip of more than 200 miles to Grand Isle, Louisiana, and back to Wolf River. The first leg of this journey was from Wolf River to Scar-iano’s Boat Works,[10] located at the west end of New Orleans. The vessel was removed from the water, placed on the ways for the first and only time since its acquisition and the bottom was copper painted. According to Perez, Scariano’s Boat Works pronounced the boat “all right.” Perez continued to pilot the cruiser on its journey to Grand Isle where it participated in the Tarpon Rodeo and from there returned to Wolf River without the manifestation of any defects.
The only question which is posed for our consideration is one of fact and that is whether any defect existed in the cruiser prior to the consummation of the sale to the plaintiff?
The trial court was obviously of the opinion that no defects existed in the hull of the cruiser prior to the sale and our examination of the record fails to disclose any error in his legal or factual conclusions.
Plaintiff’s counsel in oral argument before this court laid great stress upon the testimony of Duvic and Justice. Apparently the trial judge, who heard these witnesses, was not impressed with their testimony. On the other hand, he was obviously impressed with the evidence adduced in support of the defendant’s position that no latent defects existed in this cruiser at the time it was sold to the plaintiff on September 17, 1953, and that plaintiff had failed to carry the burden of proving[11] the existence of any defects. We believe that his conclusion in this respect was predicated upon Sellier’s testimony, who repaired the boat when it was on the ways in DeLisle, Mississippi, and upon the more pertinent fact that the plaintiff had the hull of the boat painted by Scariano’s Boat Works in New Orleans in July, 1954, or approximately nine months after the purchase thereof and they reported the boat to be “all right.” It certainly seems reasonable to believe that if any portion of the hull was in a state of decay when it was copper painted that the management of the Scariano’s Boat Works would have notified the owner thereof by whom it had been retained.
*715 But assuming arguendo that latent defects did exist in the vessel, we are convinced that the defendant possessed no knowledge thereof and, therefore, the red-hibitory action[12] or the action for a reduction of price[13] was prescribed a year from the date of the sale[14] of the cruiser to the plaintiff.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.

. G. L. Sheen and his stepson, A. M. Cook, were respectively President and Vice-President of the Orleans Storage Co., Inc., and it is conceded by the litigants that Sheen knew little or nothing about the nature of the case, but that Cook handled all negotiations leading up to the sale of the boat.

. The action for the reduction of price is subject to the same rules and the same limitations as the redhibitory action. LSA-C.C. Art. 2544. See also LSA-C.C. Art. 2534.

. Originally registered as the Margaret S.

. The limitation does not apply if the seller knew of the defect and failed to declare it to the purchaser. LSA-Civil Code, Art. 2534.

. The defects were alleged to be rot which existed in various sections of the hull and decking causing the cruiser to be unsound and unseaworthy.

. Foreman of small boat repairs at Higgins, Inc.

. Employee of Higgins, Inc., who worked on cruiser.

. DSA-R.S. 13:3741 et seq., Depositions and Discovery Act, 202 of 1952.

. The plaintiff had previously purchased the real estate from the defendants.

. It is significant to note that no employee of this shipyard was called to testify, who obviously would have been in an excellent position to testify about the condition of the hull.

.LSA-C.C. Art. 2530 provides: “The buyer who institutes the redhibitory action, must prove that the vice existed before the sale was made to him. * * * ”

. LSA-C.C. Art. 2534 provides:
“The redhibitory action must be instituted within a year, at the farthest, commencing from the date of the sale.
“This limitation does not apply where the seller had knowledge of the vice and neglected to declare it to the purchaser. * * *»

. LSA-C.C. Art. 2544 provides:
“The action for a reduction of price is subject to the same rules and to the same limitations as the redhibitory action.”

. Sale was September 17, 1953; suit was instituted July 1, 1955.